Pavithra Rajesh (SBN 323055)
    prajesh@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Uniform Fire Officers Association Family Protection Plan Local 854 and Uniformed Fire Officers Association Retired Fire Officers Family Protection Plan*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNIFORMED FIRE OFFICERS ASSOCIATION FAMILY PROTECTION PLAN LOCAL 854 and UNIFORMED FIRE OFFICERS ASSOCIATION RETIRED FIRE OFFICERS FAMILY PROTECTION PLAN, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| | **END PAYOR PLAINTIFFS' CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CLAYTON ACT, AND VARIOUS STATE LAWS** |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| TAKEDA PHARMACEUTICAL COMPANY LIMITED, TAKEDA PHARMACEUTICALS U.S.A., INC., TAKEDA PHARMACEUTICALS INC., and TWI PHARMACEUTICALS USA, INC., | |
| Defendants. | |

Plaintiff Uniform Fire Officers Association Family Protection Plan Local 854 ("UFOAFPP") and Uniformed Fire Officers Association Retired Officers Family Protection Plan ("UFOAROFPP," together with UFOAFPP: "UFOA" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through its attorneys, brings this complaint against Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A., Inc., Takeda Pharmaceuticals America, Inc. (collectively "Takeda") and TWi Pharmaceuticals, Inc. and TWi Pharmaceuticals USA, Inc. ("TWi") (together "Defendants"). These allegations are made upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.    This civil antitrust action seeks treble damages and injunctive relief to address Defendants' anticompetitive scheme to delay generic competition for Dexilant, a prescription dexlansoprazole drug product sold by Takeda for the treatment of erosive esophagitis and symptoms of gastroesophageal reflux disease, also known as GERD.

2.    Plaintiff seeks overcharge damages arising from Takeda's payments to TWi in exchange for TWi's agreement to quit its challenge to Takeda's patents and delay its entry into the dexlansoprazole market. Arrangements like this are commonly referred to as "reverse payment agreements" because the payment flows from the patent holder to the alleged infringer, which is the reverse of a typical patent litigation settlement where the infringer pays damages or royalties to the patent holder.

3.    The payment to TWi included a cash payment of $9.5 million as well as a de-facto agreement that Takeda would not compete with TWi's generic dexlansoprazole by launching an authorized generic ("AG") Dexilant.

4.    Defendants' anticompetitive conduct delayed competition in the United States[1] market for Dexilant and its generic equivalents for approximately 18 months: from June 2020 to January 2022.

---

[1] Including all United States territories, possessions, and the Commonwealth of Puerto Rico.

5.      Defendants' anticompetitive conduct further restricted competition in the United States market for Dexilant and its generic equivalents by limiting competition to a single generic for approximately 11 months after TWi's launch, during which time Takeda, by agreement, did not compete with its own authorized generic version of Dexilant.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants. The Court further has jurisdiction over this action pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 as this action also alleges violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, that are actionable under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court also has jurisdiction over the claims under the various state laws under both 28 U.S.C. § 1332(d) and 28 U.S.C. § 1367(a).

7.      This action seeks to recover treble damages, interest, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class (as defined below) resulting from Takeda's monopolization and from the Defendants' conspiracy to restrain trade in the United States market for Dexilant and its generic equivalents. The action also seeks permanent injunctive relief against Defendants to undo and prevent the unlawful conduct alleged herein.

8.      Venue is appropriate within this district as Defendants transact business here, and under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Further, Defendants and/or their agents may be found in this district.

9.      The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

# PARTIES

10.     The Uniform Fire Officers Association Family Protection Plan Local 854 and Uniform Fire Officers Association Retired Officers Family Protection Plan (collectively "UFOA" or "Plaintiff") are health and welfare benefit plans headquartered and with a principal place of business in New York, New York. The UFOA administers the assets of defined contribution plans formed by collective bargaining agreements between the City of New York and the Uniformed Fire Officers Association to provide certain benefits (including prescription drug benefits) to active and retired fire officers. They provide health and welfare benefits to approximately 10,000 individuals, including members and their families, throughout the United States. During the Class Period, the UFOA indirectly purchased and paid for some or all of the purchase price for one or more dexlansoprazole prescriptions, other than for resale, manufactured by the Defendants. UFOA made such payments and/or reimbursements in Florida, New Jersey, New York, North Carolina, Pennsylvania, and Texas. During the Class Period, UFOA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, UFOA was injured in its business or property by reasons of the violations of law alleged herein.

11.     Defendant Takeda Pharmaceutical Company Limited ("Takeda Japan") is a Japanese corporation having its global headquarters and a principal place of business at 1-1, Nihonbashi-Honcho 2-Chome, Chuo-ku, Tokyo 103-8668, Japan. Takeda Japan owns and controls Takeda Pharmaceuticals U.S.A., Inc. ("Takeda U.S.A.") and Takeda Pharmaceuticals America, Inc. ("Takeda America"). Takeda Japan, Takeda U.S.A. and Takeda America were all parties to the unlawful settlement agreement with TWi.

12.     Takeda U.S.A. and Takeda America's current principal place of business is at 95 Hayden Avenue, Lexington, Massachusetts 02421. Takeda also has United States operations near Chicago, Illinois, and in San Diego, California.

13.     Defendant TWi Pharmaceuticals, Inc. ("TWi Pharmaceuticals") is a Taiwanese corporation having a principal place of business at 3F., No. 41, Ln. 221, Gangqian Rd., Neihu Dist.,

1  Taipei City 114, Taiwan (R.O.C.). TWi Pharmaceuticals owns and controls TWi Pharmaceuticals

2  USA, Inc. ("TWi USA") with a principal place of business at 115 West Century Road, Suite 135,

3  Paramus, NJ 07652.

4      14.    All of the Defendants' wrongful actions described in this complaint are part of, and

5  in furtherance of, the illegal monopolization and restraint of trade alleged herein, and were

6  authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other

7  representatives while actively engaged in the management of Defendants' affairs (or that of their

8  predecessors-in-interest) within the course and scope of their duties and employment, and/or with

9  the actual, apparent, and/or ostensible authority of the Defendants.

10                            **REGULATORY FRAMEWORK**

11              **Drug Approval and Incentives Under the Hatch-Waxman Act**

12     15.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"),[2] manufacturers that

13  discover a new drug must file a New Drug Application ("NDA")[3] with the FDA, and have the NDA

14  approved by the FDA, prior to launching the drug into the United States market. To be approved,

15  an NDA must fully describe the drug, including data concerning its safety and efficacy, as well as

16  any information on applicable patents.[4]

17     16.    When the FDA approves a brand manufacturer's NDA, the manufacturer may list in

18  the Orange Book[5] any patents that claim the drug or a method of using the drug, and that could

19  reasonably be enforced against a generic manufacturer that makes, uses, or sells a generic version

20  of the brand drug before the expiration of the listed patents. For any patents issued after FDA

21  approval of the NDA, the manufacturer may list those patents in the Orange Book within 30 days

22  of their issuance.[6]

23  _____

24  [2] Pub. L. No. 75-717, 52 Stat. 1040 (1938) (codified as amended in 21 U.S.C. § 301 et seq.).

25  [3] 21 U.S.C. §§ 301-392.

26  [4] 21 U.S.C. §§ 355(a), (b).

27  [5] Officially known as "*Approved Drug Products with Therapeutic Equivalence Evaluations.*"

28  [6] 21 U.S.C. § 355(b)(1), (c)(2).

17.     The FDA relies on the brand manufacturer's truthfulness about patent validity and applicability because it does not have the resources or authority to verify the manufacturer's patents for accuracy or trustworthiness. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

*The Hatch-Waxman Act*

18.     To eliminate the need for prospective generic manufacturers to file lengthy and costly NDAs, the Hatch Waxman Act created the Abbreviated New Drug Application ("ANDA") pathway for generic approval.[7] An ANDA relies on the safety and efficacy established by the brand manufacturer's NDA and therefore need only show that the generic contains the same active ingredient(s) in the same strength and dosage form, with the same route of administration, and and that it is "bioequivalent" to the brand (*i.e.*, the brand and generic drugs are absorbed by the body to the same extent and at the same rate). A generic that meets these criteria is given an "AB" rating by the FDA.

19.     The FDCA and Hatch-Waxman Act operate on the principle that AB-rated generics that otherwise meet the FDA's requirements are therapeutically equivalent and may be substituted for the brand to which they are AB-rated (referred to as the "reference listed drug") and for one another.

20.     Through the Hatch-Waxman Amendments, Congress both expedited the entry of less expensive generic competitors to brand drugs, thereby reducing healthcare expenses nationwide, and simultaneously protected pharmaceutical manufacturers' incentives to create new and innovative products. Generic product launches increased substantially after the Hatch-Waxman Amendments were enacted: in 1983, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenues for brands and generics totaled $21.6 billion; by 2013, total prescription drug revenues had climbed to more than

---

[7] *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355).

$329.2 billion, with generics accounting for 86% of prescriptions.[8] Generics are dispensed about 95% of the time when a generic form is available.[9]

*Abbreviated New Drug Applications and Paragraph IV Certifications*

21.     To obtain FDA approval of an ANDA, a manufacturer must certify that the generic will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

a)  That no patent for the brand has been filed with the FDA (a "paragraph I certification");

b)  That the patent for the brand has expired (a "paragraph II certification");

c)  That the patent for the brand will expire on a particular date and the manufacturer does not seek to market its generic before that date (a "paragraph III certification"); or

d)  That the patent for the brand is invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").[10]

22.     If a generic manufacturer files a paragraph IV certification, a brand manufacturer has the ability to delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within 45 days of receiving notification of the paragraph IV certification, the FDA will not grant final approval to the ANDA until the earlier of (i) the passage of two-and-a-half years,[11] or (ii) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.[12] Until one of those conditions occurs, the FDA may grant "tentative

---

[8] *See* IMS Institute for Healthcare Informatics, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013*, at 30, 51 (2014), https://ncpa.org/sites/default/files/2020-12/IMS_2013_drug_report.pdf (last accessed on April 10, 2025).

[9] *Id*. at 51.

[10] 21 U.S.C. § 355(j)(2)(A)(vii).

[11] Commonly referred to as the "30-month stay."

[12] 21 U.S.C. § 355(j)(5)(B)(iii). The brand/patent holder can choose to sue the generic after 45 days, including waiting until the generic has launched its product, but, in that event, the brand cannot take advantage of the 30-month stay of FDA approval, and must instead satisfy the showing required to obtain a preliminary injunction to prevent the generic launch.

approval," but cannot authorize the generic manufacturer to market its product (*i.e.*, grant final approval). The FDA may grant an ANDA tentative approval when it determines that the ANDA is ready for final approval but for the 30-month stay.

*The 180-day "exclusivity" carrot*

23.    To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman Amendments grant the first paragraph IV generic manufacturer ANDA filer a 180-day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug.[13] That is, when a first-filer files a substantially complete ANDA with the FDA and certifies that the unexpired patents listed in the Orange Book as covering the brand are either invalid or not infringed by the generic, the FDA cannot approve a later generic manufacturer's ANDA until that first generic has been on the market for 180 days.[14]

24.    Although this 180-day window is often referred to as the first filer's 180-day "exclusivity," the brand manufacturer can launch an *authorized* generic at any time, taking the same product sold under the brand and selling it with a generic label at a generic price. Brand manufacturers frequently launch AGs in response to generic entry to recoup some of the sales they would otherwise lose.

25.    With or without a competing AG, the first filer's 180-day period of exclusivity is often very valuable because of high volume and higher prices compared to a multi-generic entry and can be worth several hundred million dollars in some cases.[15]

26.    A first filer that informs the FDA that it intends to wait until all Orange Book-listed patents expire before marketing its generic (*via* a paragraph III certification in its ANDA) does not

---

[13] 21 U.S.C. § 355(j)(5)(B)(iv), (D).

[14] Although first-filer exclusivity can be forfeited, that did not happen in this case.

[15] *See F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 144 (2013) ("this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" to the first filer) (quoting C. Scott Hemphill, Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem, 8 N.Y.U.L.REV. 1553, 1579 (2006)).

get a 180-day exclusivity period. Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents or to invent around such patents by creating non-infringing generics.

*Patents are subject to judicial and administrative scrutiny*

27.    Patents are not infallible and are routinely invalidated or held unenforceable, either upon reexamination or *inter partes* proceedings by the PTO, by court decision, or by jury verdict.

28.    A patent holder at all times bears the burden of proving infringement. One way that a generic can prevail in patent infringement litigation is to show that its product does not infringe the patent. Another is to show that the patent is invalid or unenforceable.

29.    The most common pathways to showing that a patent is invalid or unenforceable are obviousness (*i.e.*, the disclosed invention is obvious in light of earlier prior art); fraud on the PTO (*i.e.*, an inventor, attorney, or other person involved with the application intentionally fails to disclose material information known to that person to be material or submits materially false information to the PTO during prosecution); and/or obviousness-type double patenting (*i.e.*, when a later acquired patent is not patentably distinct from the invention claimed in an earlier patent).

30.    Thus, the PTO's decision to issue a patent is far from the final word on validity and enforcement.

31.    In fact, it is more likely that a challenged patent will be found invalid or not infringed than upheld if litigated to a decision on the merits. According to the FTC, generics prevailed in 73% of Hatch-Waxman patent litigation cases between 1992 and 2002.[16] Similarly, an analysis of patent cases filed in 2008 and 2009 found the generic wins 74% of decisions on the merits.[17]

**Generic Competition Under the Hatch-Waxman Act**

32.    AB-rated generics contain the same active ingredient(s) and have been determined

---

[16] FTC, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* vi-vii (2002), https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf (last accessed on April 10, 2025).

[17] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 Tex. L. Rev. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

to be just as safe and effective as the reference listed drug. Thus, the primary basis for competition in a genericized market is price.

33.    To facilitate this price competition, every state either requires or permits pharmacies to substitute AB-rated generic equivalents for brand prescriptions, unless the prescribing physician specifically directs that the prescription be "dispensed as written." As a result, once a generic hits the market, it typcially captures as much as 80% or more of the market within the first six months after entry. The Federal Trade Commission ("FTC") has found that on average, within a year of generic entry, prices drop 85%.[18] At the same time, there is a reduction in the average price paid for the drug at issue (brand and AB-rated generic combined). As a result, generic competition is both a serious threat to brand manufacturers' bottom line and a source of cost savings to all drug purchasers, including end payors.

34.    Brand manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to any means possible – including illegal means – to delay or prevent generic competition.

*The first AB-rated generic is priced below the brand*

35.    The first AB-rated generic is typically priced below the price of its brand counterpart,[19] and because every state either requires or permits generic substitution, the first generic manufacturer almost always captures a large share of sales from the brand.

36.    During the 180-day exclusivity period, the first filer is the only ANDA-approved generic manufacturer on the market (though the brand's AG can be, and often is, on the market during the 180-day exclusivity period). In the absence of competition from other generics, during

---

[18] FTC, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* (2010) (the "FTC Pay-for-Delay Study"), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf (last accessed on April 10, 2025).

[19] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* ii-iii, vi, 34 (2011) (the "FTC AG Study"), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf (last accessed on April 10, 2025).

1    the 180-day exclusivity period, a first-filer generic manufacturer generally makes about 80% of all

2    of the profits that it will ever make on the product.

3        *Later generics drive prices down further*

4        37.    Because AB-rated generics are essentially commodities, generic manufacturers

5    typically compete vigorously with each other through price reductions.[20] Thus the launch of a

6    second AB-rated generic drives prices down toward marginal manufacturing costs. This price

7    decline is further accelerated when there are three or more AB-rated generics on the market.

8        38.    As a result, generic drugs saved the U.S. healthcare system nearly $2.2 trillion from

9    2009 to 2019 according to the IMS Health Institute.[21]

10       *Authorized generics compete on price*

11       39.    An authorized generic is a product sold under the authority of the brand's approved

12   NDA, and is chemically identical to the brand drug, but is sold as a generic.

13       40.    If the 180-day exclusivity period applies to a first-filer ANDA, the exclusivity exists

14   only to bar the FDA from approving another ANDA during that time period. The exclusivity does

15   not apply to products sold under the authority of the original NDA. As a result, the 180-day

16   exclusivity does not bar the entry of authorized generics; the statutory scheme does not prevent a

17   brand manufacturer from marketing and selling (directly or indirectly) an AG at any time or from

18   licensing another company to do so.

19       41.    The FDA has determined that allowing brand manufacturers to introduce AGs during

20   the 180-day exclusivity period is consistent with the "fundamental objective" of the Hatch-Waxman

21   Act to encourage competition and, as a result, "lower prices in the pharmaceutical market."[22] The

22   FDA reasoned that if a brand releases an AG at a reduced price during the 180-day exclusivity

23   period, "this might reasonably be expected to diminish the economic benefit" to the generic first-

24   _____

25   [20] FTC AG Study at 66-67 (generics capture 80% or more of sales in the first six months).

26   [21] *See* FDA, *Generic Drugs: Questions & Answers*, https://www.fda.gov/drugs/frequently-asked-questions-popular-topics/generic-drugs-questions-answers (last accessed on April 10, 2025).

27   [22] U.S. Food & Drug Admin., Opinion Letter re: Citizen Petition Docket Nos. 2004P-0075/CP1 &
28   2004P-0261/CP1, at 12 (Jul. 2, 2004), https://www.regulations.gov/document/FDA-2004-P-0400-0003 (last accessed on April 10, 2025).

filer by increasing competition and causing the generic to "reduc[e] the substantial 'mark-up' [generics] can often apply during the [180-day] period."[23] Such competition, and the resulting price decreases, work to benefit drug purchasers.

42.     Brand manufacturers recognize the significant economic advantages of releasing their AGs to compete with the first-filer generic during the 180-day exclusivity period. One study noted that "pharmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[24]

43.     Competition from an AG substantially reduces drug prices and the revenues of the first-filer generic (especially during the 180-day exclusivity period).

44.     A study analyzing three examples of AGs found that "[f]or all three products, authorized generics competed aggressively against independent generics on price, and both the authorized and independent generics captured substantial market share from the brand."[25]

45.     The FTC similarly found that AGs capture a significant portion of sales, reducing the first-filer generic's revenues by about 50% on average.[26] The first-filer generic makes much less money when it faces competition from an AG because: (i) the AG takes a large share of unit sales away from the first-filer; and (ii) the presence of the AG causes prices, particularly generic prices, to decrease. Authorized generics are therefore a significant source of price competition.

**Manipulation of the Regulatory Structure to Impair Competition**

46.     The brand manufacturer of a pharmaceutical product that has no generic competition in the marketplace gets all of the profits on all of the unit sales. In this circumstance, brand manufacturers can usually sell their drug for far more than the marginal cost of production,

---

[23] *Id*. at 12.

[24] Kevin A. Hassett & Robert J. Shapiro, Sonecon, *The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals* (2007), https://www.sonecon.com/docs/studies/050207_authorizedgenerics.pdf (last accessed on April 10, 2025).

[25] Ernst R. Berndt *et al.*, *Authorized Generic Drugs, Price Competition, and Consumers' Welfare*, 26 Health Affairs 790, 796 (2007).

[26] FTC AG Study at 139.

generating profit margins in excess of 70% or more, while making hundreds of millions of dollars in sales. The ability to make those kinds of profit margins is what economists call market power.

47.     When a generic equivalent enters the market, however, it quickly captures 80% or more of the unit sales from the brand drug. When generic entry occurs, the brand manufacturer loses most of the unit sales; the generic manufacturer sells almost all of the units but at drastically reduced prices – delivering enormous savings to drug purchasers. And when multiple generics compete in the market, that competition drives prices down to near the marginal cost of production. This competition ends the brand manufacturer's market power and delivers enormous savings to drug purchasers. Competition converts what were formerly excess profits into purchaser savings.

48.     While brand manufacturers and first-filer generic manufacturers are typically marketplace competitors, they have a collective interest in preventing robust competition from other generic manufacturers – competition that severely depresses prices – from breaking out. If the brand and first-filer generic work together to prevent or delay such competition, they can keep the profit margins on all of the unit sales at 70% and split the resulting excess profits among themselves. In other words, by stifling competition, the brand manufacturer and first-filer generic manufacturer can maintain high prices, protect their profits, and split between themselves the enormous savings that increased generic competition would have delivered to drug purchasers.

49.     Figure 1 compares the impact on a brand manufacturer's profits between (i) a situation where it settles a patent lawsuit on the merits (*i.e.*, with only an agreed entry date and without a payoff to the generic company); and (ii) a situation where it settles the lawsuit with a large, unjustified payment to the generic manufacturer. In the former situation, the agreed entry date for the generic is earlier and the brand manufacturer's profits are thus greatly reduced. In the latter situation, the agreed entry date is later and the brand manufacturer's profits increase significantly.

**Figure 1.**



50.     In order for such an anticompetitive pact to work, brand and generic manufacturers need a means by which to divide between them the ill-gotten gains – the increased profit to the detriment of drug purchasers – that delayed competition makes possible. After all, the generic manufacturer will not refrain from competing if it does not share in the profit gains through some means. The means usually takes the form of payoffs from the brand manufacturer, deals that are often referred to as "reverse payment" agreements.

51.     The brand manufacturer may choose to pay off only the first filer, even if other generic manufacturers are also lined up to challenge the patents. The first filer's agreement to delay marketing its generic drug also prevents other generic manufacturers from marketing their products: none of the later filers can enter until the first filer's 180-day exclusivity period has run.

52.     Later ANDA filers have more modest financial expectations because they may have little or no expectation of any form of market exclusivity. By the time they enter the market, there is at least the brand and one other generic on the market (and often a second generic in the form of an AG) and, thus, the drug has already been, or is on its way to being, commoditized. As a result, later-filing generics can be motivated away from competitively driven modest sales results and toward anticompetitive payoffs by brand companies. Under these unlawful arrangements, the brand

shares some of its supracompetitive profits with the later-filing generics, and in exchange the later-filing generics agree to drop their patent challenges and accept a late agreed entry date.

53.    Reverse payment agreements are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. They extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs, forcing purchasers to buy expensive brands instead.

*No-AG agreements provide a means for brand and generic manufacturers to share the gains from conspiring*

54.    In the 1990s, payoffs from brand manufacturers often took the form of cash payments to would-be generic competitors. Since the 2000s – as a result of regulatory scrutiny, congressional investigations, and class action lawsuits – brand and generic manufacturers have entered into increasingly more elaborate agreements in an attempt to hide payoffs.

55.    One form of payoff is a "no-authorized generic" or "no-AG" agreement. With a no-AG agreement, the brand manufacturer agrees not to market an AG version of the brand drug for some period of time after the first generic enters the market in exchange for the first generic agreeing to a delayed entry date.

56.    No-AG agreements between a brand manufacturer and would-be generic competitors are sometimes explicit. Other times, such agreements may be structured in a way that ostensibly reserves some right in the brand manufacturer to sell a generic version of its branded product, but that still functionally acts as a no-AG agreement, resulting in the same impact on competition as an explicit no-AG agreement. The FTC recognizes the existence and impact of such functional no-AG agreements. In a study by the FTC of the settlement agreements, the FTC explained that:

> The most common form of possible compensation – appearing in 9 final settlements – is a commitment from the brand manufacturer not to use a third party to distribute an authorized generic for a period of time, such as during first-filer exclusivity. This type of commitment could have the same effect as an explicit no-AG commitment, for example, if the brand company does not market generics in the United States.[27]

---

[27] FTC, *Overview of Agreements File in NY 2016: A Report by the Bureau of Competition* (2017), https://www.ftc.gov/system/files/documents/reports/agreements-filled-federal-trade-commission-
(footnote continued)

1    57.    That same FTC report explained that an agreement that includes a "declining royalty

2    structure, in which the generic's obligation to pay royalties is reduced or eliminated if a brand

3    launches an authorized generic product" can have "the same effect as an explicit no-AG

4    commitment."[28]

5    58.    Absent a no-AG promise, it often makes economic sense for the brand manufacturer

6    to begin marketing an AG through a third party as soon as (or sometimes weeks or months before)

7    the first-filer generic enters the marketplace. The AG entry affords the brand company a price

8    strategy (competing with a low-priced generic), and this competition takes sales from what would

9    otherwise be sold by the first-filer generic. Competition from an AG typically cuts the first filer's

10   revenues approximately in half, and by having two generics in the market (the first-filer generic and

11   the AG), the two generics compete on price. This lowers prices, delivering savings to drug

12   purchases.

13   59.    To prevent an AG from causing this substantial loss of revenues and profits, a first-

14   filer generic may be willing to delay its entry into the marketplace in return for the brand

15   manufacturer's agreement to forgo competing with an AG during the exclusivity period. The

16   additional monopoly profits that the brand manufacturer gains from the delayed onset of generic

17   competition more than makes up for the profits it forgoes by temporarily not competing with its AG.

18   The brand manufacturer gains from the delayed onset of generic competition; the first filer gains

19   from the absence of generic competition for the first 180 days of marketing.

20   60.    Drug purchasers lose. The brand and first filer's reciprocal pledges not to compete

21   harm purchasers three times over. First, the pact delays the first filer's entry into the marketplace

22   and thereby extends the time during which the more expensive brand is the only product on the

23   market. Second, by delaying the first filer's entry, the pact also delays the time when other, later,

24   generics enter. Third, the pact prevents the brand from marketing an AG during the 180-day

25

26   _____

     under-medicare-prescription-drug-improvement/mma_report_fy2016.pdf (last accessed on April
27   10, 2025).

28   [28] *Id.*

_____

CLASS ACTION COMPLAINT

exclusivity period, reducing price competition during that period, particularly price competition that would otherwise occur between the first filer's generic and the brand's AG.

61. For the first-filer generic, the difference between selling the only generic and competing against an AG for 180 days can amount to tens or even hundreds of millions of dollars, depending on the size of the brand's sales. A no-AG pledge thus has the same economic effect as a cash payoff. As explained by the then-Chairman of the FTC:

> Because the impact of an authorized generic on first-filer revenue is so sizable, the ability to promise not to launch an AG is a huge bargaining chip the brand company can use in settlement negotiations with a first-filer generic. It used to be that a brand might say to a generic, "if you go away for several years, I'll give you $200 million." Now, the brand might say to the generic, "if I launch an AG, you will be penalized $200 million, so why don't you go away for a few years and I won't launch an AG."[29]

Courts agree that no-AG agreements are a form of payment actionable under *Actavis* and are anticompetitive.[30]

62. For a first-filer generic (like TWi), the difference between selling a generic without having to compete against another generic, whether AG or otherwise, amounts to tens, and in some instances, hundreds of millions of dollars. These economic realities are well known in the pharmaceutical industry. No-AG agreements thus allow competitors to benefit from an agreement

---

[29] *Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics*, FTC (June 24, 2009), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authgenstatementleibowitz.pdf (last accessed on April 10, 2025).

[30] *See In re Amitiza Antitrust Litig.*, 2022 WL 17968695, at *4 (D. Mass. Dec. 27, 2022); *Picone v. Shire PLC*, 2017 WL 4873506, at *9 (D. Mass. Oct. 20, 2017); *In re Loestrin 24 Fe Antitrust Litig.*, Nos. 14-2071, 15-1250, 2016 U.S. App. LEXIS 3049, at *25-26 (1st Cir. Feb. 22, 2016); *In re Opana ER Antitrust Litig.*, No. 14 C 10150, 2016 U.S. Dist. LEXIS 16700, at *23-25 (N.D. Ill. Feb. 10, 2016); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 242 (D. Conn. 2015); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1069 (N.D. Cal. 2014); *In re Effexor XR Antitrust Litig.*, No. 11-cv-5479, 2014 U.S. Dist. LEXIS 142206, at *62 (D.N.J. Oct. 6, 2014); *Time Ins. Co. v. AstraZeneca AB*, 52 F. Supp. 3d 705, 709-10 (E.D. Pa. 2014); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 751 (E.D. Pa. 2014); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 392 (D. Mass. 2013).

1   not to compete and deny purchasers the consumer surplus that should flow to them from increased

2   competition.

3       63.    Figure 2 depicts what happens when a settlement agreement includes a no-AG

4   promise. The red area shows the brand manufacturer's additional monopoly profits earned during

5   the period of delay. The purple area shows the amount of monopoly profit the brand manufacturer

6   gives up (*i.e.*, shares with the generic) by not selling its own AG.

7                    **Figure 2. Impact of No-AG Clause on Brand Profits**



20      64.    Figure 3 depicts the generic manufacturer's principal considerations in deciding

21  whether to accept a settlement that includes a no-AG agreement. Without a settlement, the generic

22  could enter earlier – either when the 30-month stay expires ("at risk") or when it wins the litigation.

23  The generic manufacturer's profits (gross margins) would be high during the 180-day exclusivity

24  period and then fall rapidly as additional generics enter. This profit flow is somewhat uncertain

25  because (i) if the generic launches at risk, it could (theoretically) later be found to infringe a valid

26  patent, and (ii) it is expected that the brand manufacturer will launch an authorized generic and

27  capture approximately 50% of the generic's sales. With a no-AG promise, the profit flow occurs

28  later but is more certain and is larger – roughly twice the size – because the generic manufacturer

does not lose half of the market to the brand manufacturer's authorized generic and can charge a higher price.

**Figure 3. Impact of No-Ag Promise on Generic's Profits**



65.    Payoffs by means of no-AG clauses usually exceed the value that the first filer could have obtained even if it had won the patent infringement litigation. By settling the patent case in exchange for a no-AG payoff, the first filer converts that critical six months into a period of total generic exclusivity that it was not otherwise entitled to, thus doubling its unit sales and making those sales at a higher price.

## FACTS

### Development and Approval of Dexilant

66.    Defendant Takeda Pharmaceuticals U.S.A., Inc. is the registered holder of approved New Drug Application No. 22-287 for the manufacture and sale of the drug Dexilant (dexlansoprazole).

67.    Dexlansoprazole – marketed by Takeda under the trade name Dexilant – is a proton pump inhibitor ("PPI") used for the treatment of all grades of erosive esophagitis, maintaining healing of esophagitis, and treating heartburn associated with GERD.

68.    Dexlansoprazole works through the reduction in acid in one's stomach by blocking the final step of stomach acid production. It is released in two stages, based on different acidity levels in the human intestine.

69.    The FDA approved 30 mg and 60 mg dosage forms of Dexilant on January 30, 2009.

70.    Takeda originally marketed dexlansoprazole under the name Kapidex.

71.    In or around March 2010, Takeda began marketing Kapidex under the new name Dexilant to avoid potential confusion with two other medications.

72.    Dexilant generated significant revenue and profits for Takeda. Specifically, Dexilant sales grew from around $200 million annually in 2010 to over a billion dollars annually beginning in 2015 and nearly every year thereafter until generic dexlansoprazole came to the market in 2022.

**Takeda's Patents, Orange Book Listings, and Generic Manufacturers' ANDA Filings**

73.    Due to the large market for Dexilant, it was not long before other pharmaceutical manufacturers began taking steps to launch generic versions of the drug.

74.    The path to market entry by these potential generic competitors was impacted by Takeda's Dexilant-related patents, many of which Takeda listed in the FDA's Orange Book.

75.    Takeda owns and over time has listed numerous patents in the Orange Book that it alleged covered Dexilant.

76.    Takeda also owns and has asserted claims for infringement on patent claims it alleges were infringed by generic Dexilant ANDA products, but which claims were not in a patent listed in the Orange Book.

77.    Takeda's asserted patents relating to Dexilant (including those listed in the Orange Book for NDA 22-287), along with their titles and expiration dates,[31] are as follows:

| U.S. Pat. No. | Title | Exp. Date | Listed in Orange Book |
|---|---|---|---|
| **7,737,282** | Benzimidazole Compound Crystal | 6/15/20 | No |

---

[31] Some of Takeda's patents received a patent extension for delays in regulatory approval and a pediatric exclusivity extension, which could add six months to their FDA term. For example, the '276 Patent, originally set to expire on June 15, 2020, received a patent term extension of 959 days, and a six-month pediatric exclusivity extension, resetting the patent expiration to July 30, 2023.

| 6,462,058 | A novel crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof of the present invention is useful for an excellent antiulcer agent. | 6/15/20 | Yes |
|---|---|---|---|
| 6,939,971 | Benzimidazole Compound Crystal | 6/15/20 | Yes |
| 7,285,668 | Process for the Crystallization of (R)—or (S)—Lansoprazole | 6/15/20 | Yes |
| 9,145,389 | Benzimidazole Compound Crystal | 6/15/20 | Yes |
| 6,664,276 | Benzimidazole Compound Crystal | 1/30/23 | Yes |
| 8,722,084 | Controlled Release Preparation | 10/15/23 | Yes |
| 8,784,885 | Controlled Release Preparation | 10/15/23 | Yes |
| 8,461,187 | Multi PPI Dosage Form | 1/17/26 | Yes |
| 9,238,029 | Multi PPI Dosage Form | 1/17/26 | Yes |
| 9,011,926 | Method for Producing Granules | 2/24/26 | Yes |
| 7,790,755 | Controlled Release Preparation | 8/02/26 | Yes |
| 8,105,626 | Granules Containing Acid-Unstable Chemical in Large Amount | 9/27/26 | Yes |
| 8,871,273 | Method for Producing Granules | 1/11/28 | Yes |
| 8,173,158 | Methods of Treating Gastrointestinal Disorders Independent of the Intake of Food | 3/17/30 | Yes |
| 9,233,103 | Methods of Treating Heartburn, Gastric Bleeding or Hemorrhage in Patients Receiving Clopidogrel Therapy | 3/05/32 | Yes |

78.    Due to Takeda's listing of patents in the Orange Book for Dexilant, when potential generic competitors filed ANDAs for their generic Dexilant product, they were required to certify against any patents that were listed at the time.

79.    The first company to file an ANDA and certify against Takeda's then-listed patents for the 60 mg generic dexlansoprazole product was Handa Pharmaceuticals, LLC ("Handa"). Handa's ANDA was filed on August 25, 2010, with a Paragraph IV certification to Takeda's then-

1    listed patents. Handa subsequently transferred its ANDA to Par Pharmaceutical Companies Inc.

2    ("Par") in April 2012.

3        80.    The first pharmaceutical company to file an ANDA and certify against Takeda's

4    then-listed patents for the 30 mg generic dexlansoprazole product was Impax Laboratories, Inc.

5    ("Impax"). Impax's ANDA was filed on November 30, 2010, with a Paragraph IV certification to

6    Takeda's then-listed patents.

7        81.    Generic manufacturer Anchen Pharmaceuticals, Inc. ("Anchen") filed ANDAs for

8    30 mg and 60 mg generic dexlansoprazole, which it transferred to defendant TWi in May 2011. As

9    with Par and Impax, TWi filed paragraph IV certifications to one or more of the Takeda patents then

10   listed in the Orange Book.

11       82.    Other generic manufacturers similarly filed ANDAs for 30 and/or 60 mg

12   dexlansoprazole in or around this same general time period that included paragraph IV certifications.

13   **Takeda's Infringement Suits Against Generic Manufacturers and 2013 Trial Rulings**

14       83.    The ANDA filings for generic dexlansoprazole and their accompanying paragraph

15   IV certifications resulted in Takeda filing numerous patent infringement lawsuits against TWi, Par,

16   Impax, and others.

17       84.    The first (and only) trial of Takeda's various Dexilant lawsuits took place in June

18   2013 in the Northern District of California before Judge Spero.

19       85.    The trial consolidated Takeda's then-pending actions and claims against TWi, Par,

20   and Impax. The issues in the trial were whether each ANDA infringed various claims of the '282,

21   '755, '058, '276, '971, and '668 patents, the sufficiency of the disclosures in the patents, and

22   whether the patents were anticipated or obvious in view of the prior art. The court's claim

23   construction ruling narrowed some infringement claims and subsequently, at summary judgment,

24   the court resolved additional infringement claims for each ANDA holder and certain validity

25   questions on the asserted patents.

26       86.    As to TWi, Takeda conceded that TWi's ANDA did not infringe four patents: the

27   '058, '276, '971, and '668 patents, and the court entered final judgment in TWi's favor with respect

28   to those patents. At summary judgment, the court found that TWi's ANDA did not infringe the '755

patent; however, the court granted Takeda's summary judgment motion that TWi's ANDA did infringe claims 1 and 2 of the '282 patent. The court also denied TWi's motion on invalidity of the '282 patent based on grounds of anticipation.

87.     As to Par, the court found at summary judgment that Par's ANDA did not infringe the '755 patent; however, the court denied Par's summary judgment motion of non-infringement of the '276 patent, finding triable issues of fact remained as to infringement of that patent; denied Par's motion on invalidity of the '282 patent based on grounds of anticipation; and granted summary judgment to Takeda that the Par ANDA infringed the '282 patent.

88.     As to Impax, the court found at summary judgment that Impax's ANDA did not infringe the '755 patent; however, the court granted Takeda's summary judgment motion that the '058, '276, and '971 patents were infringed by Impax's ANDA. The court rejected Impax's claims that the '971 patent lacks adequate written description to support the asserted claims and denied Impax's cross motion of non-infringement of the '971 patent. Thus, the following issues remained for trial: (a) infringement of the '276 patent against Par (Handa); (b) validity of the '276, '058, and '971 patents as obvious in view of the prior art; (c) validity of the '282 patent in view of anticipation, obviousness, or lack of sufficient written description; (d) questions of standing of certain Takeda entities to assert infringement of the '282 patent; and (e) whether Takeda could establish jurisdiction under the Declaratory Judgment Act "(DJA") against TWi for infringement of the '282 patent under §271(a) of the Patent Act.

89.     Following a weeklong trial, on October 17, 2013, the district court issued Findings of Fact and Conclusions of Law, finding that: (a) Par's product infringed the '276 patent; (b) the '276, '058, and '971 patents were not obvious in view of the prior art; (c) the '282 patent was not anticipated or obvious in view of the prior art, and did not lack sufficient written description; (d) the Takeda entities had standing to assert the '282 patent against TWi; and (e) Takeda could not assert the DJA against TWi for infringement of the '282 patent under §271(a).

90.     At the trial, TWi had presented evidence that the '282 patent was invalid based on anticipation in the prior art or obviousness:

1
2
3
4
5
6
7

Takeda concedes that the '282 patent's asserted claims are anticipated by the prior art Larsson and Von Unge references, unless the claim term "amorphous" is construed as limited to *solid* compounds. There is no "clear indication in the intrinsic record" justifying limiting the term to just solids. *E.g., Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). Takeda does not contest its own expert's testimony that the "plain and ordinary meaning" of amorphous includes nonsolids. (A1985; A1989.) Rather, Takeda admits that the extrinsic evidence shows that the term "amorphous" can be used to refer to liquids, but argues that it "typically" refers to solids. (Red Bf. 18-19.) That is not enough to limit the claims to solids, because claims are not limited only to what is "typically" used. *E.g., Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1374 (Fed. Cir. 2006).

8
9
10
11
12
13
14
15
16
17

Even if limited to only solids, the asserted claims of the '282 patent are invalid in view of the prior art Barberich reference, either alone or in combination with the other prior art. Only Takeda's argument in the District Court that Barberich was not enabled stood in the way of a holding of invalidity. But on appeal, in an attempt to deflect from its patent's written description problems, Takeda has conceded that "it is undisputed that a person of ordinary skill in the art could create a salt of an amorphous compound of dexlansoprazole (which must be solid under the court's claim construction) based on the disclosure in Barberich." (red Bf. 27.) That disposes of Takeda's ability to argue nonenablement of Barberich. Furthermore, the prior art taught three ways to make the solid amorphous solid dexlansoprazole disclosed by Barberich. Takeda myopically focuses its comments on the alleged difficulty in literally following the procedure in the Larsson reference. However, any procedure available in the prior art is sufficient. *E.g.., Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1381 (Fed. Cir. 2003). Moreover, the law embraces adaptations within the skill in the art. *E.g., In re Lamberti*, 545 F.2d 747, 750 n.2 (CCPA 1976).[32]

18
19
20
21
22
23

91.    The court's Final Judgments in each case prevented Twi from obtaining approval of its ANDA until the expiration of the '282 patent on June 15, 2020. Impax and Par, also delayed by the '282 patent, were further prevented from obtaining approval until December 20, 2020 (for Impax, after the expiration of the '058, '276, and '971 patents; and for Par, after the expiration of the '276 patent), subject to further patent term extensions for those patents under review at the Patent Office.

24
25
26

92.    The upshot of these rulings was that absent being overturned on appeal, the earliest TWi could come to market was after the expiration date of the '282 patent on June 15, 2020, and

27
28

---

[32] TWi Pharm., Incl's Response and Reply Brief, *Takeda Pharm. Co. Ltd., et al. v. TWi Pharma., Inc.*, Appeal Nos. 14-1074, 14-1129 (Fed. Cir. Nov. 24, 2014).

1  Par and Impax were blocked until at least as July 30, 2023. TWi effectively leapfrogged Par and

2  Impax in its ability to come to market, as they had now lost their first-filer status with their losses

3  at trial.

4      93.    Takeda recognized TWi's position of advantage compared to other generics due to

5  the trial rulings, stating in a post-trial press statement: "[b]ased on the ruling, Takeda expects the

6  first generic entry no earlier than June 2020."

7      **Takeda Resolves Each of Its Dexilant Patent Cases After the Initial Trial**

8      94.    Following the trial rulings, Par, Twi, and Impax all appealed the adverse aspects of

9  the district court's decision to the Court of Appeals for the Federal Circuit. Takeda also cross-

10 appealed the district court's determination that none of the generics manufactured by Par, TWi, and

11 Impax infringed the '755 patent.

12     95.    TWi presented a strong appeal challenging the validity of the '282 patent, which was

13 the only patent the district court found TWi had infringed.

14     96.    At oral argument before the Court of Appeals for the Federal Circuit on March 6,

15 2015, TWi's arguments about anticipation or obviousness found favor with the appellate panel. One

16 of the judges raised the issue of whether Judge Spero's failure to consider the evidence on this topic

17 was "clearly erroneous" and inconsistent with the evidence.

18     97.    Conversely, Takeda presented a weak appeal challenging the district court's

19 determination that none of the defendants infringed the '755 patent. The claim language is

20 unambiguous, and Takeda itself initially advocated for the claim construction adopted and applied

21 by the district court.

22     98.    All parties settled before the Court of Appeal for the Federal Circuit issued a ruling.

23     99.    Takeda settled with Par on or around July 18, 2014, and with Impax on or around

24 October 16, 2014.

25     100.   Takeda's settlement with TWi took a little longer, but approximately seven weeks

26 after oral argument before the Court of Appeals for the Federal Circuit, Takeda  settled with TWi

27 on or around April 27, 2015.

28

101.    By the end of 2015, Takeda had settled its ongoing infringement actions against all generic manufacturers whom it had sued with respect to ANDAs for Dexilant.

**Takeda's Settlement with TWi Included an Unlawful "Reverse Payment" Agreement, Whereby TWi Delayed Its Market Entry in Exchange for Significant and Unjustified Compensation from Takeda**

102.    Takeda's agreement with TWi to resolve their ongoing patent disputes regarding Dexilant was a "reverse payment" agreement in violation of the antitrust laws.

103.    At the time of settlement in 2015, the only serious obstacle to entry that TWi faced was the '282 patent, which was set to expire on June 15, 2020.

104.    TWi had very strong arguments for a reversal of the trial court's ruling with respect to the '282 patent based on invalidity because prior art anticipated or rendered obvious the asserted claims in the patent. More specifically, TWi presented strong arguments that the district court had misconstrued the claim term "amorphous compound" by limiting it to solids and that, as properly construed, the claims were anticipated by prior art. TWi also presented strong arguments that even under the district court's claim construction, the claims were invalid for lack of written description and/or because the claims were anticipated or would have been obvious by prior art.

105.    Despite its strong appellate position, and the patent's June 15, 2020, expiration date, TWi agreed to delay entry of its generic Dexilant product until January 2022, approximately 18 months after the expiration of the '282 patent.

106.    TWi agreed to this delay because Takeda agreed to provide large and unjustified payments to TWi in return.

107.    First, Takeda paid TWi $9.5 million as part of the agreement.

108.    TWi expressly acknowledged receipt of the payment in an annual financial report, stating:

> On April 27, 2015, the Company and Takeda Pharmaceutical Company Limited and its American Subsidiaries (individually and collectively "Takeda") entered into a settlement agreement with regards to pending patent litigation. In accordance with the terms of the agreement, Takeda paid the Company US$9,500 thousand.")."

109.    This payment far exceeded any reasonable estimate of Takeda's future litigation expenses. By the time of the payment, the core claims had already been tried before the district court and fully briefed and argued to the appellate court. Moreover, while Takeda had filed a separate case against TWi regarding two other patents, at the time of the settlement, the issues in that later-filed case had been considerably narrowed through an order resolving cross motions for summary judgment.

110.    On top of the $9.5 million payment, Takeda paid TWi by effectively granting TWi a monopoly on sales of generic Dexilant – the economic equivalent of a no-AG agreement.

111.    Under the terms of the Agreement, Takeda gave TWi the option of launching an AG version of Dexilant rather than launching its own ANDA product (assuming FDA approval).

112.    Given a choice between launching an AG and launching its own ANDA product, a generic manufacturer will almost always find it more profitable to launch the AG and forgo launching the ANDA product, particularly if entry by other ANDA filers is unlikely for some significant period of time. If the generic chooses to launch its ANDA product, the brand company will normally find it profitable to launch an AG in order to capture some portion of the sales that would otherwise go to the ANDA filer, splitting those sales and lowering generic prices. The generic manufacturer will almost always earn higher profits if there is a generic monopoly rather than a duopoly, even if it is required by the terms of the agreement to share those monopoly profits with the branded company.

113.    Takeda has a long history of launching AG products through one or more third parties and likely would have done the same with generic Dexilant had it not given TWi the option to launch the Dexilant AG.

114.    By giving TWi the option to launch an AG for Takeda, it effectively gave TWi the option to be the exclusive seller of generic Dexilant for a period of time. This promise was extremely valuable to TWi and induced TWi to accept a later entry date.

115.    TWi's press release shortly after the settlement summarizes its AG rights in part as follows:

As part of the settlement, the parties also entered into a License and Supply Agreement allowing TWi and its affiliates to sell Dexilant in both dosage strengths as **the** Authorized Generic. (emphasis added)

\* \* \*

Furthermore, the license and supply of the Authorized Generic from Takeda allows TWi to be ***the supplier of both strengths of a generic Dexilant in the U.S. market for a period, which provides significant sales and marketing advantage*** as well as furthering TWi's goal of bringing affordable healthcare to patients. (emphasis added)

116.    Consistent with the parties' agreement that TWi's AG rights would be exclusive, TWi describes them using the definite term "the" rather than indefinite terms such as "a" or "an," indicating that TWi understood that its AG would be the only AG on the market, as it was.

117.    TWi's references to an agreed period of time where it would have a "significant sales and marketing advantage" is also important. If Takeda retained the right to launch an AG in competition with the AG launched by TWi, there would be no need for the agreement to contain a set time period and no "significant sales and marketing advantage" during such time period.

118.    As promised to Takeda, TWi did not enter the market on June 15, 2020, when the '282 patent expired. Instead, TWi waited until on or around January 1, 2022, to launch as an AG product pursuant to its license from Takeda.

119.    Takeda has never launched an AG Dexilant product to compete with TWi.

120.    In fact, as previewed by TWi in its 2015 press release just after the Agreement was inked, the AG product TWi sold in 2022 was the sole generic on the market for nearly a year, until November 22, 2022.

121.    Due to their unlawful Agreement, both Takeda and TWi benefitted by avoiding fair and legal competition.

122.    Takeda benefitted because, rather than face competition from a generic Dexilant product, Takeda enjoyed a complete monopoly until January 2022.

123.    This unlawful extension of Takeda's monopoly allowed Takeda to continue profitably charging supracompetitive prices to purchasers much longer than would have otherwise been possible.

124.    Sales of the AG product sold by TWi were more than $328 million in 2022 alone. Had Takeda launched an AG to compete with TWi's ANDA product, the AG would have captured a large share of those sales.

125.    By giving TWi the option to launch the AG rather than Takeda, Takeda effectively gave up at least a portion of the sales it would have made by launching an AG – a large transfer of value from Takeda to TWi.

**Takeda Entered into Other Alleged Improper Agreements with Competitors During this Same Time Period**

126.    Takeda had a practice of engaging in suspect agreements with competitors during this period of time.

127.    Approximately seven months prior to the Defendants' Agreement concerning Dexilant, Takeda entered into an agreement with generic competitor Par concerning a different Takeda drug called Amitiza ("Amitiza Agreement").

128.    Similar to Defendants' Agreement here, the Amitiza Agreement is alleged to have been designed to prevent competition. Specifically, Par agreed to delay the launch of its generic Amitiza product in exchange for an implicit no-AG commitment from Takeda.

129.    Several antitrust lawsuits have been filed, and the court overseeing the case denied a motion to dismiss by Takeda, holding that the complaints in that case plausibly stated a claim of an antitrust violation.

130.    A little over a year after the Amitiza Agreement, and within a year of Defendants' Agreement here, Takeda entered into more agreements with competitors, this time concerning Takeda's drug Colcrys ("Colcrys Agreement").

131.    According to the plaintiffs in yet another antitrust case against Takeda, Takeda agreed with generic competitors to allocate the market for Colcrys.

132.    In particular, under the Colcrys Agreement, generic competitors allegedly agreed to delay their market entry in exchange for defined periods of exclusivity at a later date.

133.    The plaintiffs in the Colcrys matter defeated a motion to dismiss and summary judgment, and Takeda ultimately settled at trial before a verdict was rendered.

**If Takeda Retained the Right to Launch an AG or Received Royalties from TWi, such Facts Would Not Change the Illegality of Defendants' Agreement**

134.    The terms of Defendants' Agreement were not publicly disclosed.

135.    However, Takeda and other pharmaceutical companies have in the past, for example as alleged in Amitiza, entered into similar reverse payment agreements with competitors that, to avoid scrutiny, purportedly reserve rights to launch AGs and/or require royalties from the generic competitor when it eventually comes to market after the delay.

136.    Insofar as Defendants' Agreement here contained such terms, this would not change the illegality of Defendants' conduct.

137.    With regard to no-AG agreements, courts, including in the Amitiza lawsuit against Takeda, have held that such agreements need not be explicit: "implicit no-AG agreement[s]" are also unlawful.[33]

138.    The payment of royalties by the generic does not change the analysis. Takeda argued in Amitiza that there can be no reverse payment if a generic is paying royalties. This argument was not only rejected, but the court also further held that Takeda's royalty structure with the generic in that case itself plausibly alleged a reverse payment.[34]

139.    Accordingly, even if Takeda purported to reserve some ability to launch another AG in Defendants' written agreement, it is clear from the facts – including, *inter alia*, Takeda's failure to ever exercise any such right and TWi's statements suggesting it had exclusivity – that such a reservation was pretextual.

140.    Further, even if TWi made some royalty payments to Takeda, they would not negate the *reverse* payment from Takeda to TWi.

141.    If anything, as Takeda has done in the past, the royalty amounts and/or structure were likely set up to reinforce Takeda's commitment to not launching an AG. For example, a declining

---

[33] *Picone v. Shire PLC*, 2017 WL 4873506, at *9 (D. Mass. Oct. 20, 2017). See also *In re Amitiza Antitrust Litig.*, 2022 WL 17968695, at *4 (D. Mass. Dec. 27, 2022) (denying motion to dismiss antitrust claims against Takeda premised in part on an implicit agreement not to launch an AG).

[34] *In re Amitiza Antitrust Litig.*, 2022 WL 17968695, at *4 (D. Mass. Dec. 27, 2022).

royalty structure whereby Takeda would receive less if it launched an AG to compete with TWi would financially disincentivize Takeda from launching an AG and would in no way cleanse the Defendants' Agreement of its anticompetitive effects.

**In the Absence of Defendants' Agreement, Two Generics Would Have Been Available, at a Much Lower Price Point, by Approximately June 15, 2020, or Earlier**

142.    In the absence of Defendants' unlawful Agreement, at least two generics would have been available no later than June 15, 2020, when the '282 patent expired, instead of merely branded Dexilant.

143.    Specifically, absent the unlawful agreement, TWi would have launched its ANDA product under its own ANDA on or about June 15, 2020. In turn, Takeda would have sold an AG to compete with TWi's product to capture some of the generic market.

144.    *First*, TWi's ANDA would have been approved on or before its entry date in 2020. TWi's ANDA was ultimately approved in September 2022, but approval would not have taken that long if not for Defendants' unlawful Agreement. FDA has a practice of focusing its limited resources on approval of products whose launches are imminent. TWi's agreement to delay its launch, coupled with its ability to come to market as an AG under Takeda's NDA, disincentivized TWi from aggressively seeking earlier approval and eliminated the need for FDA to act on TWi's application sooner.

145.    *Second*, there were no first filer exclusivities standing in the way of TWi. The exclusivity of the first filers—Par on the 60 mg product and Impax on the 30 mg product—were forfeited due to their delays in getting their products tentatively approved and/or the findings of non-infringement at trial as to TWi on patents that were blocking the first filers.

146.    *Third*, Takeda's patents would not have delayed TWi's entry date. Takeda stipulated that several of its patents, specifically, the '058, '276, '971 and '668 patents, would not be infringed by TWi, and TWi prevailed on all but the '282 patent, which expired in June 2020, at the trial. While Takeda sued TWi on two other patents—the '187 and '158 patent—in a separate lawsuit, had the parties not settled, TWi would have prevailed. Among other reasons, these patents were plainly invalid due to prior art. Takeda's remaining patents purportedly covering Dexilant would have been

easy for TWi to either design around or carve out or been subject to noninfringement or invalidity defenses similar to those TWi advanced against the '187 and '158 patents. Indeed, Takeda itself recognized, before its unlawful Agreement with TWi, that generic entry was likely in June of 2020, stating: "[b]ased on the ruling, Takeda expects the first generic entry no earlier than June 2020."

## MARKET POWER AND DEFINITION

147.    The pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Dexilant, to patients without a prescription. The prohibition on dispensing certain products without a prescription creates this disconnect. The patient's doctor chooses which product the patient will buy while the patient (and in most cases, his or her insurer) has the obligation to pay for the product.

148.    Brand manufacturers, including Takeda, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

149.    The relative unimportance of price to the prescriber reduces what economists call the price elasticity of demand—the extent to which unit sales go down when price goes up. This reduced-price elasticity, in turn, gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Dexilant.

150.    Before January 1, 2022, Takeda had monopoly power in the market for Dexilant because it had the power to maintain the price of dexlansoprazole at supracompetitive levels without

losing enough sales to make supracompetitive prices unprofitable. From January 1, 2022, through November 22, 2022, Takeda and TWi combined had substantial market power in the market for Dexilant and its generic equivalent.

151.    Before January 1, 2022, a small but significant, non-transitory increase to the price of brand Dexilant would not have caused a significant loss of sales. From January 1, 2022, through November 22, 2022, a small but significant, non-transitory increase in the price of brand or generic Dexilant would not have caused a significant loss of sales.

152.    Brand Dexilant does not exhibit significant, positive cross-elasticity of demand with respect to price with any other drug other than the AG and AB-rated generic versions of Dexilant.

153.    Brand Dexilant is differentiated from all other drugs other than the AG and AB-rated generic versions of Dexilant.

154.    Takeda (and, later, Takeda and TWi) needed to control only brand Dexilant (including the AG) and its AB-rated generic equivalents, and no other products, in order to maintain the price of dexlansoprazole profitably at supracompetitive prices. Only the market entry of competing, AB-rated generic versions of Dexilant would render the Defendants unable to profitably maintain their prices for Dexilant and generic Dexilant without losing substantial sales.

155.    For several years, Takeda sold brand Dexilant at prices well in excess of marginal costs and in excess of the competitive price, and therefore, Takeda had extraordinarily high profit margins.

156.    From January 1, 2022, through at least November 2022 and likely beyond, TWi sold AG Dexilant at prices well in excess of marginal cost and in excess of the competitive price, and therefore, TWi had high profit margins.

157.    Takeda had, and exercised, the power to exclude generic competition to brand Dexilant.

158.    Takeda and TWi had and exercised the power to exclude generic competition to the TWi-marketed AG.

159.    At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected brand Dexilant from the forces of price competition.

160.   There is direct evidence of market power and anticompetitive effects available in this case sufficient to show Defendants' ability to control the price of brand Dexilant and generic Dexilant, and to exclude relevant competitors, without the need to show the relevant antitrust markets. The direct evidence consists of, inter alia, the following facts: (a) generic Dexilant would have entered the market at a much earlier date, at a substantial discount to brand Dexilant, but for the Defendants' anticompetitive conduct; (b) Takeda's gross margin on Dexilant (including the costs of marketing and its share of Takeda's ongoing research/development costs) at all relevant times was very high; (c) Takeda never lowered the price of Dexilant to the competitive level in response to the pricing of other brand or generic drugs; and (d) multi-generic entry in the real world resulted in rapid price erosion.

161.   To the extent proof of monopoly power by defining a relevant product market is required, Plaintiff alleges that the relevant antitrust market is the market for Dexilant and its AB-rated generic equivalents.

162.   The United States and its territories constitute the relevant geographic market.

163.   Takeda's market share in the relevant market was 100% until January 1, 2022, after which Takeda and TWi, collectively, had 100% market share in the relevant market until November 22, 2022, when generic seller Par launched a 60 mg generic Dexilant product.

## MARKET EFFECTS

164.   Takeda and TWi willfully and unlawfully maintained Takeda's market power—and the corresponding ability to charge monopoly prices—by entering into a reverse payment agreement that delayed the entry of generic Dexilant. In particular, Takeda paid TWi $9.5 million in cash and effectively granted TWi an 11-month monopoly over the sale of generic Dexilant in return for TWi's agreement to delay generic entry.

165.   Takeda and TWi unlawfully maintained Takeda's market power by engaging in an overarching scheme to exclude competition. Defendants designed a scheme to delay entry of generic competitors, to further Takeda's anticompetitive purpose of forestalling generic competition against Dexilant, in which TWi cooperated in order to increase its own profits. Defendants carried out the

scheme with the anticompetitive effect of maintaining supracompetitive prices for the relevant products.

166.    Defendants implemented the scheme as described herein. These acts, in combination and individually, were undertaken to serve Defendants' anticompetitive goals.

167.    Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Dexilant, and later the TWi-marketed AG Dexilant, from competition. These actions allowed Defendants to maintain a monopoly and exclude competition in the market for brand Dexilant and its generic equivalent to the detriment of Plaintiff and all other members of the end-payor class.

168.    Defendants' exclusionary conduct delayed generic competition and unlawfully enabled Takeda to sell brand Dexilant without generic competition, and then for TWi to sell AG Dexilant without generic competition. Were it not for Defendants' illegal conduct, one or more generic versions of Dexilant would have entered the market sooner and TWi would have faced competition when it eventually came to market with its generic product.

169.    As a consequence, Plaintiff and other members of the class sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

**ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE**

170.    During the relevant time period, Defendants willfully and unlawfully maintained their market power by engaging in an overarching scheme to exclude competition. Defendants designed a scheme to delay competition on the products' merits, to further Takeda's anticompetitive purpose of forestalling generic competition against Dexilant, in which TWi cooperated in order to increase its own profits. Defendants carried out the scheme, and continue to do so, with the anticompetitive intent and effect of maintaining supracompetitive prices for generic Dexilant.

171.    Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Dexilant, and later TWi's authorized generic Dexilant, from competition. These actions allowed Defendants to maintain a monopoly and

to exclude competition in the market for Dexilant and its AB-rated generic equivalents, to the detriment of Plaintiff and all other members of the Class.

172.    Were it not for Defendants' illegal conduct, generic Dexilant would have been available in the United States beginning June 15, 2020. In addition, were it not for Defendants' illegal conduct, when generic Dexilant did become available earlier, there would have been full and fair competition, thereby reducing price to a competitive level.

173.    Plaintiff has incurred significant injury and damage as a result of the unlawful conduct of Defendants. During the period from June 15, 2020 to the present, Plaintiff purchased, paid for, and/or reimbursed for Dexilant at supracompetitive levels and have done so in at least the following states: Florida, New Jersey, New York, North Carolina, Pennsylvania, and Texas. If the conduct challenged in this complaint had not occurred, Plaintiff would have paid for Dexilant under lawful competitive conditions, resulting in a substantial reduction in the amount it would have paid for Dexilant.

174.    Plaintiff and Class members have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution to payors such as Plaintiff and Class members.

175.    If generic competitors had not been unlawfully prevented from entering the market earlier and competing in the relevant markets, Plaintiff and Class members would have paid less for dexlansoprazole by (a) paying lower prices on their remaining brand purchases of Dexilant, (b) substituting purchases of less-expensive generic Dexilant for their purchases of more-expensive brand Dexilant, and/or (c) purchasing generic Dexilant at lower prices sooner.

176.    The supracompetitive prices Plaintiff and Class members paid and continue to pay are traceable to, and the direct, proximate, and foreseeable result of Defendants' anticompetitive conduct.

## INTERSTATE AND INTRASTATE COMMERCE

177.    During the relevant time period, the Defendants manufactured, sold, and shipped Dexilant (under the brand name and as an authorized generic) across state lines in an uninterrupted flow of interstate commerce.

178.    During the relevant time period, Plaintiff and Class members purchased substantial amounts of Dexilant (under the brand name and as an authorized generic). As a result of Defendants' illegal conduct, Plaintiff and Class members were compelled to pay, and did pay, artificially inflated prices for Dexilant (under the brand name and as an authorized generic).

179.    During the relevant time period, Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce. All Defendants engaged in illegal activities, as charged herein, within the flow of, and substantially affecting, interstate commerce.

180.    Defendants' conduct was within the flow of and was intended to have and did have a substantial effect on, interstate commerce of the United States, including in this district.

181.    During the Class period, each Defendant, or one or more of each Defendant's affiliates, used the instrumentalities of interstate commerce to join or effectuate the scheme. The scheme in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

182.    Defendants' conduct has also had substantial intrastate effects in that, among other things, consumers and third-party payers have been overcharged for Dexilant and its generic equivalents in each state. Defendants' conduct materially deprived the consuming public— including hundreds, if not thousands, of purchasers in each state—of any choice to purchase more affordable versions of Dexilant for approximately 18 months and has maintained supracompetitive prices through the present. Defendants' conduct has, and continues to, directly and substantially affect and disrupt commerce within each state.

## CLASS ACTION ALLEGATIONS

183.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following class:

> All persons or entities in the United States, its territories, and the District of Columbia who purchased or paid for Dexilant and/or AB-rated generic equivalents of Dexilant from a source other than (i) the Defendants or any of their subsidiaries; or (ii) any manufacturer of an AB-rated generic equivalent of Dexilant or any of its subsidiaries at any time between the date on which generic Dexilant would have become available in the absence of the Defendants' anticompetitive conduct and the date on which the anticompetitive effects of the Defendants' conduct ceases ("the Class").

184. Excluded from the Class are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

185. The members of the Class are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of members in the Class.

186. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were damaged by the same wrongful conduct of the Defendants, *i.e.*, they paid artificially inflated prices for Dexilant and its AB-rated generic equivalents and were deprived of earlier and more robust competition from more affordable generic versions of Dexilant because of the Defendants' wrongful conduct.

187. Plaintiff will fairly and adequately protect the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class.

188. Plaintiff has retained counsel competent and experienced in the prosecution of class-action antitrust litigation, with particular experience with class action litigation involving antitrust violations perpetrated by pharmaceutical manufacturers.

189. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants unlawfully maintained monopoly power through all or part of their overall anticompetitive scheme;

(b) whether there exist any legitimate procompetitive reasons for some or all of Defendants' conduct;

(c) to the extent such justifications exist, whether there were less restrictive alternatives;

(d)    whether direct proof of Defendants' monopoly power is available and, if so, whether it is sufficient to prove Defendants' monopoly power without the need to define the relevant market;

(e)    whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

(f)    whether Defendants' unlawful agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the Class;

(g)    whether Defendants conspired to delay generic competition for Dexilant;

(h)    whether Defendants' agreement was an unlawful reverse payment agreement;

(i)    whether, pursuant to Defendants' agreement, Takeda's effective promise not to compete against TWi's generic product constituted a payment;

(j)    whether Takeda's payments to TWi were large and unjustified;

(k)    whether Defendants' agreement was necessary to yield some cognizable, non-pretextual procompetitive benefit;

(l)    whether the Defendants' unlawful agreement harmed competition;

(m)    whether the agreement between Takeda and TWi alternatively constituted an agreement to allocate markets that is a *per se* violation of the Sherman Act;

(n)    whether, prior to January 2022, Takeda possessed the ability to control prices and/or exclude competition for Dexilant;

(o)    whether Defendants' unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Dexilant or in causing some amount of delay in the market entry of multiple competing AB-rated generic Dexilant products;

(p)    determination of a reasonable estimate of the length of the generic-entry delay caused by the Defendants' unlawful conduct;

(q)    the quantum of overcharges paid by the Class in the aggregate; and

1        (r)    whether Plaintiff and the proposed Class are entitled to injunctive relief in
2    order to prevent Defendants' ongoing unlawful conduct.

3    190.    A class action is superior to all other available methods for the fair and efficient
4    adjudication of this controversy because joinder of all members is impracticable.  Such treatment
5    will permit a large number of similarly-situated persons to prosecute their common claims in a single
6    forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or
7    expense that numerous individual actions would engender. The benefits of proceeding through the
8    class mechanism, including providing injured persons or entities a method for obtaining redress on
9    claims that could not practicably be pursued individually, substantially outweighs potential
10   difficulties in management of this class action.

11   191.    Plaintiff knows of no special difficulty to be encountered in litigating this action that
12   would preclude its maintenance as a class action.

13   **FIRST CLAIM**

14   **Violation of 15 U.S.C. § 1**

15   **Against Takeda and TWi**

16   192.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully
17   set forth herein.

18   193.    Defendants violated 15 U.S.C. § 1 by entering into an unlawful reverse payment
19   agreement that restrained competition in the market for Dexilant and its generic equivalents.

20   194.    Plaintiff and Class members have been injured in their business or property by the
21   violation of 15 U.S.C. § 1. Their injury consists of having paid higher prices for their
22   dexlansoprazole requirements than they would have paid in the absence of those violations. Such
23   injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it
24   flows from that which makes Defendants' conduct unlawful.

25   195.    From the launch of brand Dexilant in 2009 through January 1, 2022, Takeda
26   possessed monopoly power in the relevant market—*i.e.*, the market for sales of dexlansoprazole in
27   the United States. But for Defendants' wrongful conduct, as alleged herein, Takeda would have lost
28   its monopoly power in the relevant market beginning June 15, 2020.

196.    From January 1, 2022, to November 22, 2022, Takeda shared its monopoly power with TWi as a result of the anticompetitive reverse payment agreement between them. This agreement covers a sufficiently substantial percentage of the relevant market to harm competition.

197.    From January 1, 2022, through the present, by agreement, Takeda has not competed with its own AG Dexilant.

198.    This conduct constitutes an agreement to allocate markets and is therefore a *per se* violation of 15 U.S.C. § 1.

199.    In the alternative, there is and was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on Plaintiff, Class members, and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve such a purpose.

200.    As a direct and proximate result of Takeda and TWi's anticompetitive conduct, Plaintiff and Class members were harmed and continue to be harmed in the form of overcharges.

**SECOND CLAIM**

**Violation of 15 U.S.C. § 2**

**Against Takeda**

201.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

202.    As described above, Takeda maintained its monopoly power in the relevant market until December 31, 2021, and from January 1, 2022, to November 22, 2022, shared its monopoly power with TWi in an illegal monopoly.

203.    Takeda willfully and unlawfully engaged in continuing illegal conduct to monopolize the relevant market through at least November 22, 2022, by engaging in an anticompetitive scheme to keep AB-rated generic equivalents of Dexilant from the market—not as a result of providing a superior product, business acumen, or historical accident.

204.    Plaintiff and Class members have been injured and continue to be injured in their business or property by Takeda's violation of 15 U.S.C. § 2. Such injury consists of having paid higher prices for their dexlansoprazole requirements than they would have paid in the absence of

those violations. Such injury is of the type antitrust laws were designed to prevent, and it flows from that which makes Takeda's conduct unlawful.

## THIRD CLAIM

### Conspiracy and Combination in Restraint of Trade Under State Law

### Against All Defendants

205.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

206.    During the Class Period, Defendants engaged in a continuing contract, combination or conspiracy with respect to the sale of Dexilant in unreasonable restraint of trade and commerce, in violation of the various state antitrust statutes set forth below.

207.    During the Class Period, Defendants entered into an unlawful reverse payment agreement that restrained, and continues to restrain, competition in the market for Dexilant and/or its AB-rated generic equivalents.

208.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Dexilant and/or its AB-rated generic equivalents.

209.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated purchasers in the Class who purchased Dexilant have been harmed by being forced to pay artificially inflated, supracompetitive prices for Dexilant.

210.    In formulating and carrying out the alleged agreement, understanding, contract, combination, and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

211.    Defendants' conspiracy had the following effects, among others:

a) It delayed generic entry of Dexilant in order to lengthen the period in which Takeda's brand Dexilant could and can monopolize the market and make supracompetitive profits;

b) It kept an authorized generic from Takeda off the market during TWi's 180- day generic exclusivity period, thereby allowing TWi to monopolize the generic market for Dexilant during the period, and allowing TWi to make supracompetitive profits;

c) Even after other generics launched, Takeda continued to keep an authorized generic product from Takeda off the market; and

d) It raised and maintained the prices that the Plaintiff and Class Members have paid for Dexilant at supracompetitive levels

212.    From January 1, 2022, through November 22, 2022, Takeda shared its monopoly power with TWi, and the companies jointly maintained an illegal monopoly throughout that time.

213.    Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of Dexilant.

214.    There was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on Plaintiff, Class members and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve the purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in accordance with *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

215.    By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1401, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to Class members' purchases in California and/or purchases by California residents.

c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to Class members' purchases in Connecticut and/or purchases by Connecticut residents.

d) D.C. Code §§ 28-4501, et seq., with respect to Class members' purchases in the District of Columbia and/or purchases by D.C. residents.

e) Haw. Rev. Stat. §§ 480-1, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents.

f) 740 Ill. Comp. Stat. 10/1, et seq., with respect to Class members' purchases in Illinois and/or purchases by Illinois residents.

g) Iowa Code § 553.1, et seq., with respect to Class members' purchases in Iowa and/or purchases by Iowa residents.

h) Kan. Stat. Ann. § 50-101, et seq., with respect to Class members' purchases in Kansas and/or purchases by Kansas residents.

i) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to Class members' purchases in Maine and/or purchases by Maine residents.

j) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to Class members' purchases in Maryland and/or purchases by Maryland residents.

k) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to Class members' purchases in Michigan and/or purchases by Michigan residents.

l) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to Class members' purchases in Minnesota and/or by Minnesota residents.

m) Miss. Code Ann. §§ 75-21-1, et seq., with respect to Class members' purchases in Mississippi and/or purchases by Mississippi residents.

n) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to Class members' purchases in Nebraska and/or purchases by Nebraska residents.

o) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to Class members' purchases in Nevada and/or purchases by Nevada residents.

p) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to Class members' purchases in New Hampshire and/or purchases by New Hampshire residents.

q) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to Class members' purchases in New Mexico and/or purchases by New Mexico residents.

r) N.Y. Gen. Bus. Law § 340, et seq., with respect to Class members' purchases in New York and/or purchases by New York residents, and to the extent New York law so requires, Plaintiff hereby forgoes any penalty or minimum recovery in order to preserve the right of New York class members to recover by way of a class action.

s) N.C. Gen. Stat. §§ 75-1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

t) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to Class members' purchases in North Dakota and/or purchases by North Dakota residents.

u) Or. Rev. Stat. §§ 646.705, et seq., with respect to Class members' purchases in Oregon and/or purchases by Oregon residents.

v) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to Class members' purchases in Puerto Rico and/or purchases by Puerto Rico residents.

w) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents.

x) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to Class members' purchases in South Dakota and/or purchases by South Dakota residents.

y) Tenn. Code Ann §§ 47-25-101, et seq., with respect to Class members' purchases in Tennessee and/or purchases by Tennessee residents.

z) Utah Code Ann. §§ 76-10-3101, et seq., with respect to Class members' purchases in Utah and/or purchases by citizens or residents of Utah.

aa) W.Va. Code §§ 47-18-1, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

bb) Wis. Stat. §§ 133.01, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents

216.    Plaintiff and Class members have been injured in their business or property by reason of Defendants violations of the laws set forth above, in that they were denied the opportunity to purchase lower-priced generic Dexilant; and (ii) paid higher prices for Dexilant than they would have paid but for Defendants' unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

217.    Plaintiff and Class members accordingly seek damages and multiple damages as permitted by law.

### FOURTH CLAIM

**Monopolization and Monopolistic Scheme Under State Law**

**Against Takeda**

218.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

219.    As described above, before January 1, 2022, Takeda maintained its monopoly power in the relevant market and, from January 1, 2022, through November 22, 2022, shared its monopoly power with TWi in an illegal monopoly.

220.    Takeda willfully and unlawfully engaged in continuing illegal conduct to monopolize the relevant market through at least November 22, 2022, by engaging in an anticompetitive scheme to keep AB-rated generic equivalents of Dexilant from the market—not as a result of providing a superior product, business acumen, or historical accident.

221.     Takeda knowingly and intentionally maintained and enhanced its monopoly power in the relevant market, as described herein, injuring Plaintiff and the Class. Takeda accomplished this scheme by:

a) Delaying generic entry of Dexilant in order to lengthen the period in which Takeda's brand Dexilant could monopolize the market and make supracompetitive profits;

b) Keeping an authorized generic off the market during TWi's 180-day generic exclusivity period, and, subsequently when other generics entered the market, thereby allowing Defendants to monopolize the generic market for Dexilant during the period, and allowing Defendants to make supracompetitive profits; and

c) Raising and maintaining the prices so that Plaintiff and Class members would pay supracompetitive prices for Dexilant.

222.     The goal, purpose, and effect of Takeda's scheme was also to maintain and extend its monopoly power with respect to Dexilant. Takeda's illegal scheme allowed it to continue charging supracompetitive prices for Dexilant, without a substantial loss of sales, reaping substantial unlawful monopoly profits. Takeda's scheme also allowed TWi to reap the benefits of reduced generic competition in the United States.

223.     There is and was no legitimate, non-pretextual, procompetitive justification for Takeda's conduct that outweighs its harmful effects. Even if there were some conceivable justification, the conduct is and was broader than necessary to achieve such a purpose.

224.     As a result of Takeda's illegal conduct, Plaintiff and Class members were compelled to pay (and did pay), and continue to be compelled to pay (and do pay), more than they would have paid for Dexilant and/or its generic Dexilant absent Defendants' unlawful conduct. But for Takeda's unlawful conduct, competitors would have begun selling generic Dexilant sooner, and prices paid for the drug or its generic equivalents, would therefore, be less.

225.     Had manufacturers of generic Dexilant entered the market and lawfully competed with Takeda (and one another) in a timely fashion, Plaintiff and other Class members would have substituted lower-priced generic Dexilant for the higher-priced brand-name Dexilant for some or all of their Dexilant requirements, and/or would have paid lower net prices on their remaining Dexilant and generic Dexilant purchases.

226.    But for Takeda's illegal conduct, competitors would have begun marketing generic versions of Dexilant well before November 2022, and they would have marketed such versions successfully.

227.    By engaging in the foregoing conduct, Takeda intentionally, willfully, and wrongfully monopolized the relevant market in violation of the following state laws:

a) Arizona Rev. Stat. §§ 44-1403, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

b) Cal. Bus. & Prof. Code §§ 16700, with respect to Class members' purchases in California and/or purchases by California residents.

c) C.G.S.A. §§ 35-27, et seq., with respect to Class members' purchases in Connecticut and/or purchases by Connecticut residents.

d) D.C. Code §§ 28-4503, et seq., with respect to Class members' purchases in the District of Columbia and/or purchases by District Columbia residents.

e) Fla. Stat. §§ 501.201, et seq., with respect to Class members' purchases in Florida and/or purchases by Florida residents, and such conduct constitutes a predicate act under the Florida Deceptive Practices Act.

f) Haw. Rev. Stat. §§ 480-2, 480-9, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents.

g) 740 Ill. Comp. Stat. 10/1, et seq., with respect to Class members' purchases in Illinois and/or purchases by Illinois residents.

h) Iowa Code § 553.5, et seq., with respect to Class members' purchases in Iowa and/or purchases by Iowa residents.

i) Kan. Stat. Ann. § 50-101, et seq., with respect to Class members' purchases in Kansas and/or purchases by Kansas residents.

j) Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to Class members' purchases in Maine and/or purchases by Maine residents.

k) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to Class members' purchases in Maryland and/or purchases by Maryland residents.

l) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to Class members' purchases in Michigan and/or purchases by Michigan residents.

m) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to Class members' purchases in Minnesota and/or purchases by Minnesota residents.

n) Miss. Code Ann. §§ 75-21-3, et seq., with respect to Class members' purchases in Mississippi and/or purchases by Mississippi residents.

o) Mo. Rev. Stat. §§ 407.020, et seq., with respect to Class members' purchases in Missouri and/or purchases by Missouri residents.

p) Mont. Code Ann. §§ 30-14-101, et seq., with respect to Class members' purchases in Montana and/or purchases by Montana residents.

q) Neb. Rev. Stat. Ann. §§ 59-802, et seq., with respect to Class members' purchases in Nebraska and/or purchases by Nebraska residents.

r) Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to Class members' purchases in Nevada and/or purchases by Nevada residents.

s) N.H. Rev. Stat. Ann. §§ 356.1, et seq., with respect to Class members' purchases in New Hampshire and/or purchases by New Hampshire residents.

t) N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to Class members' purchases in New Mexico and/or purchases by New Mexico residents.

u) N.Y. Gen. Bus. Law § 340, et seq., with respect to Class members' purchases in New York and/or purchases by New York residents, and to the extent New York law so requires, Plaintiff hereby forgo any penalty or minimum recovery in order to preserve the right of New York class members to recover by way of a class action.

v) N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

w) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to Class members' purchases in North Dakota and/or purchases by North Dakota residents.

x) Or. Rev. Stat. §§ 646.705, et seq., with respect to Class members' purchases in Oregon and/or purchases by Oregon residents.

y) P.R. Laws Ann. tit. 10, §§ 260, et seq., with respect to Class members' purchases in Puerto Rico and/or purchases by Puerto Rico residents.

z) R.I. Gen. Laws §§ 6-36-5 et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents.

aa) S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to Class members' purchases in South Dakota and/or purchases by South Dakota residents.

bb) Tenn. Code Ann §§ 47-25-101, et seq., with respect to Class members' purchases in Tennessee and/or purchases by Tennessee residents.

cc) Utah Code Ann. §§ 76-10-3101, et seq., with respect to Class members' purchases in Utah and/or purchases by Utah residents.

dd) Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to Class members' purchases in Vermont and/or purchases by Vermont residents.

ee) W.Va. Code §§ 47-18-1, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

ff) Wis. Stat. §§ 133.03, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents.

228.    Plaintiff and Class members have been injured in their business or property by reason of Takeda's violations of the laws set forth above, in that they were denied the opportunity to purchase lower-priced generic Dexilant and paid higher prices for Dexilant than they would have paid but for Takeda's unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Takeda's conduct unlawful.

229.    Plaintiff and Class members accordingly seek damages and multiple damages as permitted by law.

### FIFTH CLAIM

### Violation of Section 16720 of the California Business and Professions Code ("The Cartwright Act")

### Against All Defendants

230.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

231.    The violations of federal antitrust law set forth above also constitute violations of section 16720 of California Business and Professions Code.

232.    Defendants entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 et seq.

233.    During the Class Period, Defendants entered into and engaged in a continuing unlawful contract, combination or conspiracy in unreasonable restraint of the trade and commerce described above in violation of California Business and Professions Code § 16720.

234.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members have been injured in their business and property in that they paid more for Dexilant than they otherwise would have paid in the absence of Defendants' unlawful conduct.

235.    As a result of Defendants' violation of § 16720, Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

**SIXTH CLAIM**

**Violation of Section 17200 of the California Business and Professions Code
(Unfair Competition Law)**

**Against All Defendants**

236.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

237.    The violations of federal antitrust law set forth above also constitute violations of section 17200, et seq. of California Business and Professions Code, also known as the Unfair Competition Law (the "UCL").

238.    Defendants have engaged in unfair competition or unfair and/or unconscionable acts or practices in violation of the UCL by engaging in the acts and practices specified above. Defendants engaged in business practices that are unfair in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Class members.

239.    There are no countervailing benefits to Class members and any utility of Defendants' conduct is outweighed by the consequences to class members.

240.    Defendants' conduct also constitutes an unlawful business practice in that it violates the Sherman Act as set forth above and violates Cal. Health & Safety Code § 134002.

241.    The effects of the illegal conduct alleged herein are continuing and the effects of the conspiracy continue to harm Plaintiff and members of the Class.

242.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and the members of the Class to pay supracompetitive and artificially inflated prices for Dexilant sold in the United States. Plaintiff and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

243.    Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices pursuant to California Business and Professions Code sections 17203 and 17204.

## SEVENTH CLAIM

### Unfair Methods of Competition and Unfair and/or Unconscionable Conduct in Violation of State Consumer Protection Laws

### Against All Defendants

244.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

245.    Defendants engaged in unfair methods of competition or unfair and/or unconscionable conduct in violation of the state consumer protection statues listed below.

246.    There was and is a gross disparity between the price that Plaintiff and the Class members paid for Dexilant and the value they received. Much more affordable generic Dexilant would have been and would be available, and prices for Dexilant would have been and would be far lower, but for Defendants' unfair competition or unfair and/or unconscionable conduct.

247.    Takeda implemented dramatic price increases since 2009.

248.    Lower-priced generic Dexilant would have been available sooner, and prices for Dexilant would have been and would be far lower, but for Defendants' unfair competition or unfair and/or unconscionable conduct.

249.    As a direct and proximate result of Defendants' unfair competition or unfair and/or unconscionable conduct, Plaintiff and Class members were: (i) denied the opportunity to purchase lower-priced generic Dexilant; and (ii) forced to pay higher prices for Dexilant than they would have paid but for Defendants' unlawful conduct.

250.    The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiff and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

251.    By engaging in such conduct, Defendants violated the following consumer protection laws:

a) Alaska Stat. Ann. §§ 45.50.471, et seq., with respect to Class members' purchases of Dexilant in Alaska and/or purchases by Alaska residents.

b) Ariz. Rev. Stat. Ann. §§ 44-1521, et seq., with respect to Class members' purchases of Dexilant in Arizona and/or purchases by Arizona residents.

c) Ark. Code Ann. §§ 4-88-101, et seq., with respect to Class members' purchases of Dexilant in Arkansas and/or purchases by Arkansas residents.

d) Cal. Bus. & Prof Code §§ 17200, et seq., with respect to Class members' purchases of Dexilant in California and/or purchases by California residents. Defendants engaged in business practices that are unfair in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to class members. There are no countervailing benefits to class members and any utility of Defendants' conduct is outweighed by the consequences to class members. Defendants' conduct also constitutes an unlawful business practice in that it violates the Sherman Act as set forth above and violates Cal. Health & Safety Code § 134002.

e) D.C. Code §§ 28-3901, et seq., with respect to Class members' purchases of Dexilant in D.C. and/or purchases by D.C. residents.

f) Fla. Stat. §§ 501.201, et seq., with respect to Class members' purchases of Dexilant in Florida and/or purchases by Florida residents.

g) Haw. Rev. Stat. §§ 481-1, et seq., with respect to Class members' purchases of Dexilant in Hawaii and/or purchases by Hawaii residents.

h) 815 Ill. Comp. Stat. 505/1, et seq., with respect to Class members' purchases of Dexilant in Illinois and/or purchases by Illinois residents.

i) Mass. Gen. Laws ch. 93A, §§ 1 et seq., with respect to Class members' purchases of Dexilant in Massachusetts and/or purchases by Massachusetts residents.

j) Mich. Comp. Laws §§ 445.901, et seq., with respect to Class members' purchases of Dexilant in Michigan and/or purchases by Michigan residents.

k) Mo. Rev. Stat. §§ 407.010, et seq., with respect to Class members' purchases of Dexilant in Missouri and/or purchases by Missouri residents.

l) Mont. Code §§ 30-14-101, et seq., with respect to Class members' purchases of Dexilant in Montana and/or purchases by Montana residents.

m) Neb. Rev. Stat. §§ 59-1601, et seq., with respect to Class members' purchases of Dexilant in Nebraska and/or purchases by Nebraska residents.

n) Nev. Rev. Stat. Ann. §§ 598.0903, et seq., with respect to Class members' purchases of Dexilant in Nevada and/or purchases by Nevada residents.

o) N.H. Rev. Stat. Ann. §§ 358-A:1, et seq., with respect to Class members' purchases of Dexilant in New Hampshire and/or purchases by New Hampshire residents.

p) N.M. Stat. Ann. §§ 57-12-1, et seq., with respect to Class members' purchases of Dexilant in New Mexico and/or purchases by New Mexico residents.

q) N.C. Gen. Stat. §§ 75-1.1, et seq., with respect to Class members' purchases of Dexilant in North Carolina and/or purchases by North Carolina residents.

r) R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to Class members' purchases of Dexilant in Rhode Island and/or purchases by Rhode Island residents, for personal, family and/or household use.

s) S.C. Code Ann. §§ 39-5-20, et seq., with respect to Class members' purchases in South Carolina and/or purchases by South Carolina residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce. Defendants' conduct is offensive to public policy and immoral, unethical, and oppressive.

t) Utah Code Ann. §§ 13-11-1, et seq., with respect to Class members' purchases of Dexilant in Utah and/or purchases by Utah residents for personal, family, or household purposes.

u) Vt. Stat Ann. tit. 9, § 2453, et seq., with respect to Class members' purchases of Dexilant in Vermont and/or purchases by Vermont residents. Defendants engaged in unfair methods of competition, unfair practices, and/or deceptive practices in the conduct of trade and commerce.

v) W. Va. Code §§ 46A-6-101, et seq., with respect to Class members' purchases of Dexilant in West Virginia and/or purchases by West Virginia residents.

w) Wis. Stat. § 100.20, et seq., with respect to Class members' purchases of Dexilant in Wisconsin and/or purchases by Wisconsin residents.

252.    Plaintiff and Class members have been injured in their business and property by reason of Defendants' unfair competition or unfair and/or unconscionable conduct. Their injury consists of paying higher prices for Dexilant than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

253.    On behalf of itself and the Class, Plaintiff seeks all appropriate relief provided for under the foregoing statutes.

**EIGHTH CLAIM**

**Unjust Enrichment**

**Against All Defendants**

254.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

255.     Plaintiff bring this Court on behalf of the Class except for Delaware, Georgia, Indiana, Kentucky, Louisiana, New Jersey, Ohio, Oklahoma, Pennsylvania, Texas, Virginia, Washington, and Wyoming.

256.     To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

257.     Defendants have reaped and retained substantially higher profits due to their unlawful scheme.

258.     Plaintiff and Class members have conferred and continue to confer an economic benefit upon Defendants in the form of profits resulting from the unlawful overcharges from Dexilant sales described herein, to the economic detriment of Plaintiff and Class members.

259.     Defendants' financial gain from their unlawful conduct is traceable to overpayments for Dexilant by Plaintiff and Class members.

260.     It would be futile for Plaintiff and Class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Dexilant, as those intermediaries are not liable and would not compensate Plaintiff and Class members for Defendants' unlawful conduct.

261.     Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and Class members for Dexilant sold by Takeda during the Class Period.

262.     The financial benefits the Defendants derived from overcharging Plaintiff and Class members for Dexilant is a direct and proximate result of Defendants' unlawful practices described herein.

263.    The financial benefits Defendants derived are ill-gotten gains that rightfully belong to Plaintiff and Class members, who paid and continue to pay artificially inflated prices that inured to Defendants' benefit.

264.    It would be wrong and inequitable under unjust enrichment principles under the laws of the relevant jurisdictions for Defendants to be permitted to retain any of the overcharges that Plaintiff and Class members paid for Dexilant that were derived from Defendants' unlawful practices described herein.

265.    Defendants are aware of and appreciate the benefits that Plaintiff and Class members have bestowed upon them.

266.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of the Plaintiff and Class members.

267.    Plaintiff and Class members are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct, and to the establishment of a constructive trust consisting of such amount, from which Plaintiff and Class members may make claims on a pro rata basis.

## NINTH CLAIM

**For Declaratory and Injunctive Relief for Violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 16 of the Clayton Act, 15 U.S.C. §§ 1-2, 26**

### Against All Defendants

268.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

269.    Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

270.    As set forth in Count 1, 2, 3, 4, 5 and 11, Defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

271.    Plaintiff and Class members have been injured in their business or property by reason of Defendants' antitrust violations. Their injury consists of paying higher prices for Dexilant than they would have paid in the absence of those violations. These injuries will continue unless halted.

272.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of Sections 1 and 2 of the Sherman Act.

273.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct and to restore competition in the market for Dexilant.

## ADEQUATE REMEDIES AT LAW

274.    To the extent that equitable relief is sought under any of the above claims, Plaintiff pleads such claims in the alternative to any legal claims and further plead that their legal claims do not provide adequate remedies at law. Until discovery and other pretrial matters are complete, the extent to which the legal claims above may provide the same relief for the same harms as could be available under claims providing equitable relief is unknown. Restitution may, for example, be measured differently than legal damages and provide for a different amount of relief. The difference between the value of restitution and legal relief will therefore be unknown until, at the earliest, the completion of expert reports and discovery.

275.    In states where only equitable remedies are available for claims of unfair, unlawful, or unconscionable conduct (such as claims under the California Unfair Competition Law), legal claims that prohibit fraudulent conduct or provide for implied warranties would not be adequate to provide relief for such unfair or unconscionable conduct. In other instances, equitable claims broadly prohibit fraudulent conduct whereas legal claims only prohibit specifically enumerated types of conduct. The legal claims thus do not inherently provide the same relief for the same harms as the equitable claims.

## DEMAND FOR JUDGMENT

276.    WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully demands that this Court:

a) Determine that this action may be maintained as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and appoint Plaintiff as the named representative of the Class;

b) Award Plaintiff and the Class damages (i.e., three times overcharges) in an amount to be determined at trial, plus interest in accordance with law;

c) Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

d) Permanently enjoin Defendants both from continuing the unlawful conduct alleged here, and from engaging in similar or related conduct in the future;

e) Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy the Defendants' unjust enrichment;

f) Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

g) Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

277.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

DATED:  April 15, 2025

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Pavithra Rajesh*

Pavithra Rajesh (SBN 323055)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  prajesh@glancylaw.com


**GLANCY PRONGAY & MURRAY LLP**

Brian D. Brooks
bbrooks@glancylaw.com
Lee Albert
lalbert@glancylaw.com
Brian P. Murray
bmurray@glancylaw.com
Greg Linkh
glinkh@glancylaw.com
230 Park Avenue, Suite 358
New York, NY 10169
Telephone:  (212) 682-5340